**Nancy HARRIS, on her own behalf and as the Personal Representative of the Estate of Charles Harris, Plaintiff,**

v.

**AC & S, INC., et al., Defendant.**

**No. EV 90–150–C.**

United States District Court,
S.D. Indiana,
Evansville Division.

June 6, 1995.

Order Granting Reconsideration
and Directing Final Judgement
Dec. 19, 1995.

Edward F. Brennan, Brennan Cates & Constance, Belleville, IL, Stephen Laudig, Indianapolis, IN, Timothy Eble, Charleston, SC, Fred Baker, Ness Motley Loadholt Richardson & Poole, Charleston, SC, Curtis E. Shirley, Cremer & Miller, Indianapolis, IN, for Nancy Johanna Harris.

John C. Cleary, Leboeuf Lamb Greene & MacRae L.L.P., Pittsburgh, PA, for Aluminum Co. of America, Jerry Lee Walker.

James G. McDonald, III, Princeton, IN, Charles Courtney, Jr., Kurowski & Courtney, Swansea, IL, for A.W. Chesterton Co.

Keith A. Kinney, Hill Fulwider McDowell Funk & Matthews, Indianapolis, IN, Knight S. Anderson, Hill Fulwider McDowell Funk & Matthews, Indianapolis, IN, for Anchor Packing Co.

Maxwell Gray, Lowe Gray Steele & Hoffman, Indianapolis, IN, for BASIC Inc.

Robert D. Maas, Jennings & Maas, Carmel, IN, for Empire Ace Insulation Mfg. Corp.

Eric L. Zalud, Benesch Friedlander Coplan & Aronoff, Cincinnati, OH, for Fiberboard Corp. (PABCO) Pittsburgh–Corning Corp.

Dennis F. Cantrell, Bingham Summers Welsh & Spilman, Indianapolis, IN, for Keene Corp., Pittsburgh–Corning Corp., Owens–Illinois Inc.

Robert A. Bunda, Bunda Stutz & Dewitt, Toledo, OH, for Keene Corp., Owens–Illinois Inc.

Peter E. Carlson, Kelley Drye & Warren, Chicago, IL, Debra L. Burns, Bose McKinney & Evans, Indianapolis, IN, George E. Purdy, Bose McKinney & Evans, Indianapolis, IN, for Owens–Corning Fiberglas Corp.

Robin L. Babbitt, Bingham Summers Welsh & Spilman, Indianapolis, IN, Kathy K. Condo, Shaw Reed Smith & McClay, Pittsburgh, PA, for Pittsburgh–Corning Corp.

## *MEMORANDUM*

BROOKS, District Judge.

This matter comes before the Court on several motions to strike evidentiary materials and numerous motions for summary judgment.

### *Statement of Relevant Facts*

Charles Harris was employed at the Aluminum Company of America ("ALCOA") Warrick operations near Newburgh, Indiana, from September 1970 through February 1988. (Verified Affidavit of Nancy Harris, hereinafter "Harris Aff."). Charles Harris worked in ALCOA's Ingot Department as a trucker,[1] laborer, furnace operator and melting attendant. (Harris Aff.; Deposition of Timothy R. McMurtry taken July 7, 1994, at 18, hereinafter "McMurtry Dep. at ——"). The Ingot Department is an area of the ALCOA plant approximately a third of a mile long and a quarter of a mile wide. (McMurtry Dep. at 21). Charles Harris worked the "Dow Rotation" shift (seven days straight eight hour work days followed by two days off, then switch shifts and repeat), until the last six to eight months of his employ when he worked twelve hour shifts. (Harris Aff.).

Nancy Johanna Harris, the wife of Charles Harris, alleges that while employed as a furnace operator at ALCOA, Mr. Harris was exposed to dust from asbestos and asbestos-containing products mined, manufactured, processed, imported, converted, compounded, or sold by Defendants. Ms. Harris alleges

---

**1.** According to testimony a "trucker" is a forklift operator. (McMurtry Dep. at 7, 18).

such exposure caused Charles Harris' fatal mesothelioma. (Complaint, ¶¶ 5 and 8).

### Product Identification Witnesses

Tim McMurtry was Charles Harris' co-worker and co-furnace operator for approximately sixteen years. McMurtry worked in the Ingot Department on the same shift as Charles Harris for Harris' entire ALCOA tenure. (McMurtry Dep. at 21). As co-furnace operators McMurtry and Harris worked on both the same and separate furnaces. (McMurtry Dep. at 22).

Grant Beauchamp was not an ALCOA employee but was employed as supervisor for various independent contractors during six different steamfitting operations at the ALCOA Warrick operations between 1964 and 1969. (Deposition of Grant Beauchamp taken September 1, 1994, and October 21, 1994, at 9–12, 28, 106, 209, 230, hereinafter "Beauchamp Dep. at ———").[2] Grant Beauchamp supervised erection of piping and gasket installation, including some asbestos-containing gasket materials throughout the ALCOA Warrick Operations. (Beauchamp Dep. at 13). Grant Beauchamp supervised steamfitting and pipefitting, not the installation of insulation, (Beauchamp Dep. at 214),[3] nor did he order the insulation materials. (Beauchamp Dep. at 219). However, Grant Beauchamp was in the habit of keeping records of many of the materials used on the jobsite, including the materials of other contractors. (Beauchamp Dep. at 219, 319). Grant Beauchamp kept his records of other's products somewhat informally: he would find the empty and discarded packaging materials on the floor and note such findings in his personal records. (Beauchamp Dep. at 323, 324). Thus, when questioned, Grant Beauchamp agrees it is possible the materials were not necessarily installed where he might have recorded the packaging materials. (Beauchamp Dep. at 196, 245). In preparation for various asbestos-related lawsuits, Grant Beauchamp executed an affidavit at some point in 1993 naming products he recalled installing or otherwise recalled from his informal product records and at which facilities he recalled those products.[4] (Beauchamp Dep. at 54–61, 93).

"[V]ery little" of Grant Beauchamp's work at ALCOA was actually conducted in the Ingot Department; his work there was limited to overhead heating. (Beauchamp Dep. 113–14), and even that work in the Ingot Department was limited to that "just one time ..." (Beauchamp Dep. at 193). Grant Beauchamp admitted no knowledge regarding whether Charles Harris was actually exposed to any asbestos-containing product. (Beauchamp Dep. at 337). In fact, Grant Beauchamp never knew Charles Harris, (Beauchamp Dep. at 44, 45, 75, 269, 310); Charles Harris did not begin at ALCOA until 1970, Grant Beauchamp's last project was in 1969. (See Id.). During Grant Beauchamp's work periods at ALCOA the Ingot Department was not yet functional; it was only utilized as a storage area. (Beauchamp Dep. at 114).[5]

In discussing whether the pipe insulation at ALCOA could be a significant source of asbestos dust, the pipefitting supervisor noted generally: "If asbestos covering ruptures on the steam lines, if steam[ ] lines shake and rattle and they do, they pound, they condensate, it vibrates and shakes the piping and insulation too. That's on the steam lines.

---

2. Mr. Beauchamp revisited the ALCOA plant during 1978. However, due to the fact Mr. Beauchamp has no recollection of the products used in 1978, (Beauchamp Dep. at 130), such visit will be given no consideration in this cause.

3. Grant Beauchamp did note that his pipe fitting work was occasionally impeded by in-place insulation which was necessarily removed in small quantities and replaced by his crew. (Beauchamp Dep. at 16).

4. The date of execution of Mr. Beauchamp's affidavit is unknown because the date at the signature line only indicates the year as 1993.

Grant Beauchamp apparently provided information to Plaintiff's counsel for this and other lawsuits. His employment as a journeyman pipe fitter and supervisor took him to numerous facilities and involved a multitude of products. Mr. Beauchamp used his notes and papers from his employment to compile lists and summaries of lists of products and their associated installation/utilization site. (Beauchamp Dep. at 45, 152, 253).

5. Whether a product identification witness knew the decedent is relevant to the witness' ability to testify to the decedent's direct asbestos exposure.

Otherwise, if it's not damaged, it doesn't generally get airborne." (Beauchamp Dep. at 346).

Kenny Pate, Jr., is a pipe fitter who participated in projects at the ALCOA Warrick operations. (Deposition of Kenny Pate, Jr. taken February 16, 1995, at 9, hereinafter "Pate Dep. at ——"; Affidavit of Kenny Pate, Jr. executed February 8, 1995, hereinafter "Pate Aff."). In his affidavit Kenny Pate stated he worked in the Ingot Department at ALCOA "above the furnaces on the air lines, steam piping, and cold water lines." (Pate Aff.). Kenny Pate's work involved fitting pipes together, not setting insulation. (Pate Dep. at 9, 153). Nevertheless, Kenny Pate's affidavit speaks of asbestos sheets emitting dust when torn or cut, pipe coverings emitting asbestos dust when removed, and dust created by shredding and tearing of insulation that would occur during application—all of which "was inhaled by the workers in the Ingot Dept." (Pate Aff.). In his deposition, however, Kenny Pate testified that the installation of a new gasket would not emit dust. (Pate Dep. at 200). Like Grant Beauchamp, Kenny Pate never knew Charles Harris. (Pate Dep. at 9, 153).

William Shaw installed coal piping in the ALCOA Warrick operations at some point during 1979. (Affidavit of William Shaw executed December 20, 1994, hereinafter "Shaw Aff."; Deposition of William Shaw taken February 17, 1995, at 100, 102–03, 210, hereinafter "Shaw Dep. at ——"). In his affidavit, William Shaw spoke of asbestos dust emission in the Ingot Department when "sheet gasketing, packings, and blankets ... [were] cut or torn into the correct sizes or when being removed and replaced. The preformed gaskets would often tear and crumble during application, causing fibers to be released into the air." (Shaw Aff.). During deposition testimony William Shaw was unsure of the exact department of his work but noted it was "in the center, the center of the plant ... It was centrally located and probably halfway up in the plant. It's probably a couple hundred feet." (Shaw Dep. at 103).

Most likely he said, second or third floor. (Shaw Dep. at 212). The Ingot Department is not located near this described location. (Beauchamp Dep. at 107, 113). Similar to Grant Beauchamp and Kenny Pate, William Shaw did not know Charlie Harris. (Shaw Dep. at 213).[6] Accordingly, William Shaw recognizes that without actually knowing Charles Harris he could not identify any products to which Charlie Harris might have been exposed. (Shaw Dep. at 213).

Jerry Walker worked at the ALCOA Warrick operations as a mechanical specifications designer for the Ingot Department furnace rebuild program. (Deposition of Jerry Walker taken March 28, 1995, at 154–55, hereinafter "Walker Dep. at ——"). Mr. Walker did not work in the Ingot Department; his duties entailed drafting plans for furnace rebuild programs. (Walker Dep. at 154–55). Jerry Walker did not personally install any of the Defendant's products, and while he did see the installation of certain materials, he has no specific recollection of what those materials might have been. (Walker Dep. at 77–79). While Jerry Walker testified that it was rather dusty in the Ingot Department, he testified that he did not have independent knowledge as to whether that dust contained asbestos. (Walker Dep. at 81). Although Plaintiff offers his testimony for product identification, Jerry Walker does not claim to have independent knowledge of the products used in the Ingot Department nor of the source of asbestos dust into the air in the Ingot Department. (Walker Dep. at 77–81, 159–61, 164). Like Grant Beauchamp, William Shaw, and Kenny Pate, Jerry Walker did not know Charlie Harris. (Walker Dep. at 34).

J.V. Sexton worked as Charles Harris' co-furnace operator in the Ingot Department at ALCOA Warrick operations from 1966 to 1994, a period fully encompassing Charles Harris' ALCOA tenure. (Affidavit of J.V. Sexton executed November 22, 1991, hereinafter "Sexton Aff. I"; Affidavit of J.V. Sexton executed December 22, 1994, hereinafter "Sexton Aff. II"). J.V. Sexton's second affi-

6. While William Shaw did testify he knew a pipefitter named Charlie Harris, he did not claim to know, and Plaintiff does not contend he did know the decedent Charlie Harris the furnace operator. (Shaw Dep. at 213).

davit speaks of asbestos-containing gasket material tearing or crumbling during use that would emit asbestos dust "so thick that you could see it in the air. The dust would build up on surfaces for days, becoming airborne again and again when disturbed." (Sexton Aff. II).

Paul McDaniel worked at ALCOA as a brickmason from 1973–1994. (Affidavit of Paul Edward McDaniel, hereinafter "McDaniel Aff.").[7] McDaniel's affidavit spoke of "[d]ust generated from furnace repair jobs or a complete rebuild of a furnace in one complex [that] would travel to all areas of the ingot department.... The dust in the ingot department was often so dense that it could be seen in the air.... While working with the above mentioned products, asbestos dust was produced which was inhaled by the workers in the ingot department." (McDaniel Aff.).

Joe Hayes worked at ALCOA from 1965 until 1988 and will provide product identification testimony in this case. (Affidavit of Joe Hayes executed November 22, 1991, hereinafter "Hayes Aff.").

### Product Identification Evidence

Product identification is the factual element most central to this lawsuit, thus the remaining factual statement will set forth the witnesses who identified what products and where they were able to identify those products.

Defendant Pittsburgh–Corning, Inc. ("P–C") participated in the asbestos-bearing product market and manufactured, among other things, "Unibestos" pipe covering, block and corrugated material. Grant Beauchamp's initial affidavit was executed in 1993. In this first affidavit Grant Beauchamp did not articulate the presence of Unibestos at ALCOA; accordingly, the extent of his memory of Unibestos at ALCOA was not exam-

ined in either his September 1, 1994, or October 21, 1994 depositions. However, in his second affidavit, executed December 27, 1994, some twenty-eight days subsequent to the filing of P–C's motion for summary judgment, Grant Beauchamp specifically claimed the presence of P–C Unibestos pipe covering, block and corrugated material in the Ingot Department. (Affidavit of Grant Beauchamp executed December 27, 1994, at 1). The affidavit does not speak to any particular usage of Unibestos, but Plaintiff's argument infers it was used in the furnace and/or the overhead steamlines. The second Beauchamp affidavit is the only product identification of Unibestos.

In his deposition Tim McMurtry testified about the solid asbestos furnace walls but could not articulate a specific manufacturer. (McMurtry Dep. at 12–14). Nevertheless, evidence indicates the furnaces were removed and destroyed every 18 months. (Deposition of Clenneth Besing taken September 1, 1994, at 85, hereinafter "Besing Dep. at ——"). The demolition of which would create significant amounts of dust in the Ingot Department. (Besing Dep. at 52; McMurtry Dep. at 60–61). Plaintiff does not provide evidence that piping would be torn out with the same frequency. In fact, Grant Beauchamp expected the steel piping he installed to be in place for thirty to forty years. (Beauchamp Dep. at 344). Jim LaPlante, Facilities Maintenance Planner/Scheduler for the Ingot Department,[8] has testified furnace tearouts and reconstructions do not entail demolition of hot water or steam lines. (Deposition of Jim LaPlante taken February 10, 1995, at 125).

Defendant Owens–Corning Fiberglas Corporation ("OCF") participated in the market for high temperature asbestos-containing insulation from at least 1953 until 1973. (Affidavit of William J. Burns, Jr., executed Feb-

---

7. The McDaniel Affidavit is "Dated this *24* day of *1994*, 1994." The twenty-four and 1994 are handwritten, and unfortunately no party clarifies the date of this execution.

 Paul McDaniel executed a second affidavit at some point in March of 1995. For reasons detailed more fully below this Court will disregard this latter affidavit, thus discussion of the testimony therein is unwarranted at this point.

8. Jim LaPlante has held his present position since 1985, prior to which time he was one of the facilities maintenance unit supervisors from 1979 until 1985, and prior to that he was brick mason installing refractories in the Ingot Department. (LaPlante Dep. at 6–8).

ruary 22, 1995, ¶¶ 2, 3, hereinafter "Burns Aff. I, ¶ ——"). OCF manufactured and/or distributed a rigid asbestos-containing thermal insulation commonly known as "Kaylo." (Burns Aff. I, ¶¶ 3, 4). Although Kaylo is an OCF product name, the term "kaylo," or some phonetic derivation similar thereto, is a commonly used trade name generally describing a particular type of insulation without regard to any specific manufacturer. (Beauchamp Dep. at 88; Affidavit of William J. Burns, Jr., executed March 2, 1995, "Burns Aff. II"; Affidavit of Jerry L. Hesler executed March 2, 1995, ¶ 4, hereinafter "Hesler Aff., ¶ ——"). "Kaylo" purportedly refers to a low K-value, a recognized unit of measure for the thermal conductivity of a solid. A solid with a low K-value would demonstrate insulative qualities superior to that of a solid with a higher K-value. (Hesler Aff., ¶ 4).

Grant Beauchamp's affidavit recalls with specificity the use of "Owens Corning Fiberglas Kaylo Block at the Alcoa Powerhouse . . . in 1957, 1958, and 1959." (Beauchamp Aff. I at 7). Notably, Charles Harris worked on the "Plant" side of the ALCOA facility, not the "Powerhouse" side. (Beauchamp Dep. at 27, 28). Nevertheless, at his deposition Grant Beauchamp was unable to state with any certainty which manufacturer's rigid insulation products were at the ALCOA site. (Beauchamp Dep. at 17, 22–25, 239). Throughout his deposition Grant Beauchamp testified that he knew only of the presence of the generic "kaylo" without regard to a specific manufacturer. (Beauchamp Dep. at 84–89, 257, 259, 260).[9]

Kenny Pate's affidavit recalls the use of OCF kaylo heat insulation to insulate water pipes in the Ingot Department, some 60 feet above finished floor elevation. (Pate Aff.; Beauchamp Dep. at 119, 194). As stated above, Kenny Pate's affidavit speaks of dust created by shredding and tearing of insulation that would occur during application—all

of which "was inhaled by the workers in the Ingot Dept." (Pate Aff.). In his deposition, however, Kenny Pate testified that he was unable to specifically name products used in the Ingot Department with any certainty. (Pate Dep. at 193–95, 198–200).

Defendant Georgia–Pacific, Inc. ("Georgia–Pacific") manufactures a variety of building products, and at one point, a variety of asbestos-containing products. (Affidavit of Gary A. Ricards executed August 2, 1994, ¶ 6, hereinafter "Ricards Aff. I, ¶ ——"; Affidavit of Gary A. Ricards executed November 29, 1994, ¶ 6, hereinafter "Ricards Aff. II, ¶ ——"). Plaintiff brings only two Georgia–Pacific products into issue: Georgia–Pacific "All Purpose Joint Compound" ("GP Joint Compound") and Georgia–Pacific "Bestwall Firestop XXX" ("GP Bestwall").[10] (Beauchamp Dep. at 287). Grant Beauchamp's initial affidavit did not specifically name either product, but his deposition testimony reflected his recollection of their presence at ALCOA. (Beauchamp Dep. at 284–87). GP Bestwall, according to Grant Beauchamp, was present at the ALCOA facility, but he could not identify the product nor could he testify to actually seeing the product in use or otherwise installed at the ALCOA facility. (Beauchamp Dep. at 284–87). Beyond reading the product name in his personal record summaries, Grant Beauchamp had no recollection of GP Bestwall. (Beauchamp Dep. at 284–86). Georgia–Pacific brings forward evidence that GP Bestwall was never an asbestos-containing product and that Georgia–Pacific has never manufactured any asbestos-containing wall board. (Ricards Aff. II, ¶ 6).

Grant Beauchamp had a more specific recollection of GP Joint Compound. Grant Beauchamp testified GP Joint Compound was used at ALCOA in the joints of troughs for the molten aluminum run-off. (Beauchamp Dep. at 276–77). Beauchamp testified that he never actually saw this particular application of GP Joint Compound, (Beau-

---

**9.** Grant Beauchamp testified that OCF products were used in the ALCOA facility, but was unable to identify any specific OCF product that was used in the facility. (Beauchamp Dep. at 208).

**10.** Tim McMurtry's affidavit also refers an "all purpose joint cement," however, Plaintiff does

not pursue this particular product to the point that discussion is required. The Court is operating on the assumption the All Purpose Joint Compound covers the identified all purpose joint cement.

champ Dep. at 280–81), as the containers were always closed when he saw them, (Beauchamp Dep. at 283), but he nevertheless assumed that the joint compound was used as he indicated. (Beauchamp Dep. at 281–82).

Tim McMurtry has a similar recollection of GP Joint Compound: GP Joint Compound was used in the metal troughs used for the molten aluminum run-off. (McMurtry Dep. at 29–37). Tim McMurtry identified the GP Joint Compound container and product, (McMurtry Dep. at 30), and said that he saw the run-off trough application hundreds of times, (McMurtry Dep. at 33): "They had to put—it seems like they put can torches—like, they heated it, so when the metal—it had to be completely dry. If the metal run over it if it wasn't, it'd blow up." (McMurtry Dep. at 35). The troughs would be broken out with jackhammers and replaced once every three to four months. (McMurtry Dep. at 30–32, 37, 61). Though he never saw Charles Harris in a situation where he was near the trough removal process, (McMurtry Dep. at 38), he testified that the removal process created large amounts of dust that could have been inhaled by the workers in the Ingot Department. (McMurtry Dep. at 30–32, 61).

Georgia–Pacific offers evidence that AL-COA "never used any Georgia–Pacific joint compound product in connection with the troughs or in contact with molten aluminum." (Affidavit of Jeff Gorss executed November 29, 1994, ¶ 6). Georgia–Pacific contends its joint compound products "were not designed and could not be used to seal joints between adjacent pieces of metal. Moreover, these joint compound products could not have withstood the heat of molten aluminum. They would have softened and deteriorated immediately." (Ricards Aff. I, ¶ 7).

Defendant The Anchor Packing Company ("Anchor Packing") sold or distributed fluid sealant products, gaskets, some asbestos-bearing, some not. (Garlock's Answers No. 2). Grant Beauchamp recalled in his deposition the use of Anchor Packing sheet gaskets when cut into ring gaskets for use in the heat flanges. (Beauchamp Dep. at 291, 292, 294, 307, 308). His recollection was not that An-chor Packing gaskets were used in the Furnace or Ingot Departments, but only in the "general area." (Beauchamp Dep. at 291–92, 294, 307, 308).

Kenny Pate, in deposition testimony, specifically recalled the Anchor Packing logo on blue sheets of flat stock used for gaskets cut on-site. (Pate Dep. at 238; see also Pate Aff.). Kenny Pate's affidavit indicated "[t]he packings and asbestos sheets would emit dust when torn or cut into correct sizes and shapes ... [which] produced asbestos dust, which was inhaled by the workers of the Ingot Department at Alcoa." (Pate Aff.). However, at his deposition Kenny Pate recalled only the use of Anchor Packing materials "in the carbon press room and probably the roll and mill." (Pate Dep. at 239). Kenny Pate's deposition testimony did not specifically recall using Anchor Packing products in either the Furnace or Ingot Departments. (Pate Dep. at 239).

Defendant Garlock, Inc. ("Garlock") sold or distributed various fluid-sealing products, gaskets, both asbestos-bearing and nonasbestos-bearing. (Garlock's Answers, No. 3). Garlock represents that its asbestos-containing products encapsulated or otherwise retained the asbestos, thus, short of damaging the product, asbestos would not be released. (Garlock's Answers, 3(e), 3(f)).

Grant Beauchamp's deposition testimony generally recalls the use of Garlock sheet gaskets, pre-cut gaskets and twisted packing materials but never in the Furnace or Ingot Departments, only in the general area. (Beauchamp Dep. at 295, 297–98, 302, 306). Grant Beauchamp testified that he did not know whether Charles Harris was actually exposed to any asbestos-containing products. (Beauchamp Dep. at 337).

Kenny Pate's affidavit indicates the use at ALCOA of "Garlock woven asbestos gasketing cloth and compressed sheets (gaskets) ..." (Pate Aff.). In Kenny Pate's deposition testimony, however, he revealed the fact that, similar to "kaylo," he used "garlock" as a generic trade name for a specific type of gasket that could have been produced by any number of manufacturers. (Pate Dep. at 105–07, 185, 193–95). Kenny Pate testified

that without reference to the project specifications he could not differentiate one gasket from the next; he could only recognize the garlock-type gasket without regard to a specific a manufacturer. (Pate Dep. at 193–95, 198–200). Kenny Pate never actually saw the boxes that contained the gaskets he installed, (Pate Dep. at 199), and he noted he did not recall any specific names, markings, or symbols on products, thus on the job he had no real means to identify a specific product manufacturer. (Pate Dep. at 199–200). Further, while Kenny Pate's affidavit speaks of asbestos sheets emitting dust when torn or cut, (Pate Aff.), his deposition testimony indicates he never cut prefabricated gaskets: "you were just tearing them up if you did that. There was no purpose." (Pate Dep. at 207).

William Shaw's affidavit recalls the use of Garlock compressed asbestos sheet gasketing, pre-cut gaskets, and water pump packing. (Shaw Aff.). William Shaw's affidavit continues: "While the above mentioned products were being used, the workers in the ingot department were exposed to airborne asbestos dust." (Shaw Aff.). William Shaw, however, also refers to Garlock as a generic trade name—a specific type of product produced by any number of manufacturers. (Shaw Dep. at 100). In fact, William Shaw testified that he was unaware Garlock was a manufacturer of what he termed Garlock-type gaskets, (Shaw Dep. at 209), he did, however, recall numerous other possible manufacturers of the garlock gaskets. (Shaw Dep. at 196). William Shaw was not responsible for ordering the materials utilized in his work, accordingly he testified that he was unsure whether Garlock products were used in the ALCOA plant. (Shaw Dep. at 98–99).

Defendant John Crane, Inc. ("John Crane") manufactures fluid sealing products, rubber gaskets in particular. Grant Beauchamp recalled the use of John Crane products at the ALCOA Warrick operations during his deposition testimony. (Beauchamp Dep. at 201, 307). However, his recollection of the actual use of John Crane gaskets conflicts: first he testifies John Crane products were not typically used in the furnace area because it was high pressure, an inappropriate usage for rubber gaskets such as John Crane, (Beauchamp Dep. at 176, 201); and then Grant Beauchamp testifies "a lot" of John Crane products were used in the furnace and ingot departments. (Beauchamp Dep. at 307).

J.V. Sexton's affidavit indicates the presence of John Crane adapter donuts and flanges in the Ingot Department. (Sexton Aff. II). As mentioned above, J.V. Sexton's affidavit speaks of asbestos-containing gasket material tearing or crumbling during use that would emit asbestos dust "so thick that you could see it in the air. The dust would build up on surfaces for days, becoming airborne again and again when disturbed." (Sexton Aff. II). At his deposition J.V. Sexton recalled seeing a John Crane box with an adapter donut inside. (Sexton Dep. at 154). J.V. Sexton did not, however, have any indication whether that particular product was an asbestos-containing product. (Sexton Dep. at 154). Similarly, while his affidavit indicates adapter donuts emit dust when torn out, J.V. Sexton did not testify to witnessing Charles Harris performing such a task. (Sexton Dep. at 158).

William Shaw's affidavit recalls the use of John Crane asbestos sheet valve packing, cranite discs, cranite sheet valve packing, flange style packings for bronze and iron body valves and packing for steel valves. (Shaw Aff.). The affidavit further stated that this "sheet gasketing, packings, and blankets would emit dust when cut or torn into the correct sizes or when being removed and replaced. The pre-formed gaskets would often tear and crumble during application, causing fibers to be released into the air." (Shaw Aff.). William Shaw, however, never knew the decedent Charles Harris. (Shaw Dep. at 71).

Defendant A.W. Chesterton Company ("AWC") is a manufacturer of fluid sealing devices, some of which contained asbestos and some of which did not. (AWC's Reply Brief in Support of Summary Judgment at 1). J.V. Sexton and Joe Hayes both testified to the presence of AWC asbestos-containing products at ALCOA Warrick operations. (Sexton Aff. II; Hayes Aff.). While Joe

Haye's affidavit only indicates the presence of AWC products, J.V. Sexton's second affidavit speaks of asbestos fibers from packings becoming airborne when cut or torn into the correct sizes or from shredding during use. (Sexton Aff. II). The workers in the ingot department would be regularly exposed to the asbestos dust from this and other sources. (Sexton Aff. II).

Nearly five years after filing, lengthy multi-district venue proceedings, and extensive discovery, the defendants move for summary judgment. The Court will address the issues in for an against the various motions to strike and motions for summary judgment in turn.

### Discussion

Asbestos is a naturally occurring fibrous material that resists fire and most solvents. It was used in the manufacturing of many products and structures during the first several decades of the Twentieth Century. Its major uses included heat-resistant insulators, cements, building materials, fireproof gloves and clothing, and motor vehicle brake linings. It is, in the words of one court, a "one-time miracle fabric turned cancer-causing nightmare." *Edwards v. Armstrong World Industries, Inc.*, 6 F.3d 312, 313 (5th Cir.1993). It is pervasive in industrial and construction settings; it can also be debilitating and deadly. "It is beyond cavil that asbestos causes or significantly contributes to an increase in mortality and an increase in serious irreversible, or incapacitating reversible, illness...." *Metal Trades, Inc. v. United States*, 810 F.Supp. 689, 698 (D.S.C.1992).

"Clinical evidence of the adverse effects associated with exposure to asbestos, tremolite, anthophyllite, and actinolite, is present in the form of several well-conducted epidemiological studies of occupationally exposed workers, family contacts of workers, and persons living near asbestos, tremolite, anthophyllite, and actinolite mines. These studies have shown a definite association between exposure to asbestos, tremolite, anthophyllite, and actinolite and an increased incidence of lung cancer, pleural and peritoneal mesothelioma, gastrointestinal cancer, and asbestosis. The latter is a disabling fibrotic lung disease that is caused only by exposure to asbestos...." 29 C.F.R. § 1910.1001, App. H. Charles Harris died of mesothelioma in 1988 and now his widow seeks monetary renumeration against numerous manufacturers of asbestos-bearing products in an effort to regain some of what she has lost.

### Jurisdiction

■ This Court has jurisdiction to rule on this matter pursuant to 28 U.S.C. § 1332, diversity jurisdiction. Plaintiff Nancy Harris is a citizen of the state of Indiana residing in Boonville, Indiana. The Defendant corporations are all foreign corporations with principal places of business outside the State of Indiana. The amount in controversy is in excess of $50,000, exclusive of interest and costs.

### GOAL Order

■ Before significant analysis of product identification and proximate cause issues, several Defendants move this Court to strike and/or disregard various evidentiary materials at summary judgment on the ground that Plaintiff failed to comply with witness and product identification disclosure requirements of the General Order on Asbestos Litigation ("GOAL").

The GOAL was created by agreement between counsel for all parties to this litigation and with the aid of United States Magistrate Judge John Paul Godich. Magistrate Godich signed the GOAL affecting this matter on February 13, 1991, in *In Re: Asbestos Plaintiffs' Laudig Cases.*

The GOAL initially affected roughly one hundred asbestos-related personal injury actions involving hundreds of defendants and an even greater number of potential product identification witnesses. The GOAL was intended to streamline discovery and provide for early disposition of unmeritorious claims through forcing disclosure of product identification evidence by a specific date.

The GOAL provides as follows: "Except for good cause shown, Plaintiff shall be prohibited from introducing product identification evidence where it has not been disclosed in his/her interrogatory answers." (GOAL at 15). However, should the Court find good

cause for "the introduction of such product identification evidence, any affected defendant shall be given a timely opportunity ... to conduct written and depositional discovery concerning such evidence." (GOAL at 15). Nevertheless, the GOAL ultimately provides: "Upon notice of and a showing by a particular defendant that plaintiff has failed to show exposure in its interrogatory answers to that defendant's product, plaintiff's case shall be dismissed with prejudice to that defendant, but with costs to plaintiff." (GOAL at 16).

Through the GOAL and subsequent amendments to the GOAL, Plaintiff's product identification evidence disclosure was to be complete by April 1, 1994. When Plaintiff failed to comply with the April 1, 1994 deadline, United States Magistrate Judge William G. Hussmann, Jr., by marginal notation dated May 4, 1994, ordered Plaintiff to comply with the GOAL and Amended GOAL requirements by June 1, 1994. On June 30, 1994, Georgia–Pacific's Motion to Dismiss for failure to comply with the GOAL was denied under the revised GOAL.

In this instance several Defendants contend Plaintiff's case against them should be dismissed or various product identification evidence should be stricken or disregarded due to untimely disclosure under the GOAL. Plaintiff's answers to the master set of interrogatories were filed September 27, 1993. Interrogatory No. 31 asked Plaintiff to "[l]ist each and every asbestos-bearing product which it is alleged Plaintiff used or came in contact with during the times and under circumstances related to in the Complaint." Plaintiff's response directed the parties to seventeen affidavits thereto attached. While the seventeen affidavits purportedly included all the witnesses known at that time, it was subsequently revealed these seventeen affidavits did not exhaust several witness' product identification knowledge. In particular: Grant Beauchamp's initial affidavit did not identify P–C Unibestos, thus his recollection was not examined during his deposition, but a subsequently executed affidavit names P–C Unibestos among those products used at AL-COA; Paul McDaniel's second affidavit, executed March of 1995,[11] was produced for the

first time in opposition to Garlock and Anchor Packing's motion for summary judgment—Paul McDaniel's first affidavit did not name a single Garlock product, thus his memory thereof was not investigated at his February 21, 1995 deposition; OCF was similarly indicted by Paul McDaniel; and though his memory of OCF was investigated, Kenny Pate was not originally included as an OCF product identification witness.

Bearing in mind the objectives of the GOAL and the associated remedy, to provide "any affected defendant ... a timely opportunity ... to conduct written and depositional discovery concerning such [product identification] evidence," (GOAL at 15), this Court will disregard affidavit product identification where the relative timing effectively foreclosed the affected Defendant's opportunity to examine a witness' memory of a product at deposition. To rule otherwise would virtually gut the objective of the GOAL—prejudicing Defendants in this and other cases affected by the GOAL. This analysis is consistent with the holdings in this Circuit discrediting affidavits subsequent to depositions. *See, e.g., Russell v. Acme–Evans Co.,* 51 F.3d 64, 67 (7th Cir.1995); *Visser v. Packer Engineering Associates, Inc.,* 924 F.2d 655, 659 (7th Cir.1991) (en banc); *DF Activities Corp. v. Brown,* 851 F.2d 920, 923 (7th Cir.1988).

Accordingly, Grant Beauchamp's second affidavit will be disregarded to the extent he names P–C Unibestos, and pursuant to Anchor Packing and Garlock's motion to strike, Paul McDaniel's second affidavit will be stricken. Kenny Pate's affidavit, however, will not be disregarded due to the fact the affected Defendant was able to examine his memory during deposition testimony.

**Motions to Strike Evidentiary Materials**

In addition to the matters stricken or otherwise disregarded under the GOAL, several additional motions to strike evidentiary material offered in support of Plaintiff's position opposing summary judgment must be addressed.

In particular, Defendant Georgia–Pacific moves this Court to strike both the Affidavit of Grant Beauchamp executed December 27,

---

11. The actual date of the affidavit's execution is unknown.

1994, on the grounds that it contradicts prior sworn deposition testimony and Exhibit 15 as attached to Plaintiff's Brief in Opposition to Georgia–Pacific's Motion for Summary Judgment on the grounds that it is not properly authenticated. Defendants Garlock and Anchor Packing move to strike the affidavits of Kenny Pate, William Shaw, and Grant Beauchamp on the grounds that they contain bald conclusory statements which contradict sworn deposition testimony. Defendants Garlock and Anchor Packing also move to strike the affidavit of Jerry Walker on the grounds that it contains "blatantly incorrect and seriously misleading conclusory statements which are not based upon his person knowledge" which is directly manifested by his deposition testimony. (Garlock and Anchor Packing's Motion to Strike Walker Aff. at 2). Plaintiff has elected to not oppose any of these motions to strike.

■ On a summary judgment motion, when a party seeks to offer evidence through exhibits, they must be identified by affidavit or otherwise be admissible. *Martz v. Union Labor Life Insurance Co.,* 757 F.2d 135, 138 (7th Cir.1985). "Supporting materials designed to establish issues of fact in a summary judgment proceeding 'must be established through one of the vehicles designed to ensure reliability and veracity—depositions, answers to interrogatories, admissions and affidavits. When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence.'" *Friedel v. City of Madison,* 832 F.2d 965, 970 (7th Cir.1987), quoting *Martz,* 757 F.2d at 139.

■ Affidavits presented in opposition to a motion for summary judgment must be based upon personal knowledge; a statement merely indicating that a purported affidavit is based upon "information and belief" is insufficient. *Price v. Rochford,* 947 F.2d 829, 832–33 (7th Cir.1991); *Visser,* 924 F.2d at 659; *Schertz v. Waupaca County,* 875 F.2d 578, 582 (7th Cir.1989). Rule 56(e) requires that any such affidavits "set forth such facts as would be admissible in evidence, and ... show affirmatively that the affiant is competent to testify to the matters stated therein." Conclusory statements or indications of opin-

ion or belief offered without any factual support are also insufficient to create a genuine issue of fact. *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992); *Covalt v. Carey Canada, Inc.,* 950 F.2d 481 (7th Cir. 1991); *Mestayer v. Wisconsin Physicians Service Ins. Corp.,* 905 F.2d 1077, 1079 (7th Cir.1990); *Davis v. City of Chicago,* 841 F.2d 186, 189 (7th Cir.1988). This rule "demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. County of Du Page,* 715 F.2d 1238, 1243 (7th Cir.1983), *cert. den'd,* 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984). Thus, if the affidavit contains ultimate or conclusory facts or conclusions of law, *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007 (7th Cir.1985), or statements made on belief or "on information and belief," *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), those parts of the affidavit cannot be considered on a summary judgment motion. However, the fact that an affidavit has some inadmissible portions does not contaminate it entirely; a court can rely on the valid portions, and simply disregard any unacceptable sections. *See Russell v. Keyes Fibre Co.,* 771 F.Supp. 951, 957 n. 5 (N.D.Ind.1991); *Bennett v. Village of Oak Park,* 769 F.Supp. 1035, 1039 n. 3 (N.D.Ill.1991).

■ Further, the Seventh Circuit has "been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit." *Russell,* 51 F.3d at 67. As the *Russell* court observed: "Almost all affidavits submitted in litigation are drafted by the lawyers rather than by the affiants...." *Russell,* 51 F.3d at 67 (citing *DF Activities Corp.,* 851 F.2d at 923; *Visser,* 924 F.2d at 659). As with the affidavit in *Russell,* a review of the contested affidavits against the diction of the respective witness' deposition testimony proves this case presents no exception. Thus, as directed by the *Russell* court, "[w]here deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement

in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse in memory is in the circumstances a plausible explanation for the discrepancy." *Russell,* 51 F.3d at 67–68, (citing *Slowiak v. Land O' Lakes, Inc.,* 987 F.2d 1293, 1297 (7th Cir.1993); *Adelman–Tremblay v. Jewel Cos.,* 859 F.2d 517, 520–21 (7th Cir.1988); *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861 (7th Cir.1985)).

■ Addressing first Exhibit 15 as attached to Plaintiff's Brief in Opposition to Georgia–Pacific's Motion for Summary Judgment, the final two pages thereof are photographic reproductions of Georgia–Pacific joint compound containers. No witness authenticates or even refers to these pictures. Accordingly, Exhibit 15 as attached to Plaintiff's Brief in Opposition to Georgia–Pacific's Motion for Summary Judgment is hereby stricken.

■ With regard to affidavits offered in opposition to summary judgment, Jerry Walker's affidavit will be addressed first as it presents the most serious situation. As Defendants Garlock and Anchor Packing contend, Jerry Walker's deposition indicates his affidavit contained numerous inaccuracies and many patent untruths and that he signed the affidavit sent to him by Plaintiff's counsel because he thought it was required. (Walker Dep. at 58, 59, 157–161). Jerry Walker also testified in his deposition that he simply did not represent to Plaintiff's counsel many of the product identifications set forth in the affidavit. (Walker Dep. at 158–161). Plaintiff's reprehensible procurement and reliance on this affidavit is beyond discussion. The Affidavit of Jerry Walker is hereby stricken.

■ Grant Beauchamp's December 27, 1994 affidavit and the affidavits of Kenny Pate and William Shaw do not present the same egregious situation encountered with Jerry Walker's affidavit but rather facts more in line with *Russell.* Accordingly, the Court will not strike the affidavits per se, but through the direction of *Russell* this Court will disregard affidavit testimony to the extent it is inconsistent with sworn deposition testimony. Finally, the necessity for reliable evidence will not be limited to the vigilant

Defendant: this Court will *sua sponte* disregard affidavit testimony where it proves inconsistent with or otherwise contradicts deposition testimony. *See Russell.*

**Summary Judgment**

■ Under Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden may be met by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554.

■ Once a properly supported motion for summary judgment is made, the party that bears the burden of proof on a particular issue at trial cannot resist the motion by merely resting on its pleadings. *United States v. Lair,* 854 F.2d 233, 235 (7th Cir. 1988). Rather, the party opposing the motion must "affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC,* 840 F.2d 405, 410 (7th Cir.1988); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.1987); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *McMillian v. Svetanoff,* 878 F.2d 186, 188 (7th Cir.1989); *Jakubiec v. Cities Service Co.,* 844 F.2d 470, 473 (7th Cir.1988). The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988).

The record and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party, *Beard v. Whitley County REMC,* 840 F.2d 405, 410 (7th Cir.1988) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). Nevertheless, "[a] scintilla of evidence in support of the nonmovant's position is insufficient to successfully oppose summary judgment; 'there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Brownell v. Figel,* 950 F.2d 1285 (7th Cir.1991) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)).

In diversity cases, this Court applies the state law that would be applied in this context by the Indiana Supreme Court. *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1404–05, 28 L.Ed.2d 822 (1971); *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Clarin Corp. v. Massachusetts General Life Ins. Co.,* 44 F.3d 471, 474 (7th Cir.1994); *Fidelity and Guar. Ins. v. Everett I. Brown Co.,* 25 F.3d 484, 486 (7th Cir.1994). Where the state supreme court has not ruled on an issue, decisions of intermediate state courts control unless there are persuasive indications that the highest state court would decide the issue differently. *L.S. Heath & Son v. AT & T Information Sys.,* 9 F.3d 561, 574 (7th Cir. 1993) (citing *Hicks v. Feiock,* 485 U.S. 624, 630 n. 3, 108 S.Ct. 1423, 1428 n. 3, 99 L.Ed.2d 721 (1988)). However, as the United States Court of Appeals for the Seventh Circuit has recently noted, "[n]either the Indiana Supreme Court nor the Indiana Court of Appeals has set forth a test for causation in asbestos cases." *Peerman v. Georgia–Pacific Corp.,* 35 F.3d 284, 286 (7th Cir.1994). This Court has no desire to—as the Seventh Circuit has noted—"make incorrect predictions as to undecided questions of state law," *Collins Co. v. Carboline Co.,* 837 F.2d 299, 301 (7th Cir.1988), but the analysis may proceed nonetheless as an exact causation standard under Indiana law would be unnecessarily and prematurely determined. The only relevant inquiry at this stage is with regard to which, if any, Defendants has

Plaintiff provided enough evidence such that this matter should go before a jury. In short, this Court will require Plaintiff to provide evidence establishing a reasonable nexus between the decedent Charles Harris and a Defendant's product when capable of producing airborne asbestos.

The recent *Peerman* decision is instructive. There the plaintiff's deceased husband, Gerald Peerman, worked for the same industrial employer for nearly twenty years, and after significant exposure to a variety of asbestos-containing products died from mesothelioma. *Peerman,* 35 F.3d at 285. Gerald Peerman's widow brought an action in this Court against numerous manufacturers and distributors of asbestos containing products with which Gerald Peerman was alleged to have come into contact. *Id.* Summary judgment was granted in favor of defendants June 18, 1993. Affirming summary judgment, the Seventh Circuit stopped short of expressing a causation standard, and specifically refused to adopt either the direct nexus requirement of *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480, 1482 (11th Cir.1985), or the "job site" approach seen in *Lockwood v. AC & S, Inc.,* 44 Wash.App. 330, 722 P.2d 826 (1986), *aff'd,* 109 Wash.2d 235, 744 P.2d 605 (1987) (en banc), and applied in *Richoux v. Armstrong Cork Corp.,* 777 F.2d 296 (5th Cir.1985). *Peerman,* 35 F.3d at 286–87. Rather, the Seventh Circuit undertook an analysis similar to what this Court must now undertake in summary judgment.

The *Peerman* court held the plaintiff's failure to bring forward evidence of defendant products producing dust in any reasonable proximity to Gerald Peerman was the fatal error. *Peerman,* 35 F.3d at 287. In particular, one defendant product involved plaster-type joint compound and another involved an asbestos-laden spray, both products are semi-liquid generally incapable of creating dust which could have been inhaled by the decedent—until applied. *Id.* However, while the plaintiff was able to link the decedent to the defendant products while in the semi-liquid state, she was unable to place the decedent any where near the products when they were capable of producing dust. Thus, the Seventh Circuit held: "no matter what

test for causation is applied, Mrs. Peerman has failed to produce evidence to support a reasonable inference that the defendants' products caused her husband's mesothelioma." 35 F.3d at 287.[12]

 Causation itself is ultimately a question of fact, *S & S Truck Repairs v. Mofield,* 556 N.E.2d 1313, 1314 (Ind.1990); *P.H. & F.M. Roots Co. v. Meeker,* 165 Ind. 132, 73 N.E. 253, 255–56, 165 Ind. 132, 137–39 (1905), the burden of proof of which remains with the Plaintiff. *See Peak v. Campbell,* 578 N.E.2d 360, 361 (Ind.1991) (citing *City of Indianapolis v. Cauley,* 73 N.E. 691, 694, 164 Ind. 304, 311 (Ind.1905)). In Indiana, "a jury's determination of proximate cause must be based upon provable facts 'and cannot be based on mere guess, conjecture, surmise, possibility, or speculation.'" *Collins v. American Optometric Ass'n,* 693 F.2d 636, 640 (7th Cir.1982) (quoting *Halkias v. Gary National Bank,* 142 Ind.App. 329, 234 N.E.2d 652, 655 (1968)); *see also American Optical v. Weidenhamer,* 457 N.E.2d 181, 183 (Ind.1983) (to succeed at trial, plaintiff must prove, "by a preponderance of the evidence, that his injury was the proximate result of the breach of some duty owed him by one or more of the defendants").[13]

 Similarly, in ruling on summary judgment, this Court is "not required to draw every conceivable inference in favor of the nonmoving party," *Richards v. Combined Insurance Company of America,* 55 F.3d 247, 251 (7th Cir.1995), Plaintiff is "only entitled to the benefits of all *reasonable* or *justifiable* inferences...." *Rand v. CF Industries, Inc.,* 42 F.3d 1139, 1146 (7th Cir.1994) (emphasis original). Credibility judgments and other forms of factfinding are inappropriate in summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–251, 255, 106 S.Ct. 2505, 2510–2512, 2513–2514, 91

L.Ed.2d 202 (1986) (court accepts as true non-movant's evidence, draws all legitimate inferences in favor of the non-movant, and does not weigh the evidence or the credibility of witnesses); *Cameron v. Frances Slocum Bank & Trust Co.,* 824 F.2d 570, 575 (7th Cir.1987) ("a court can neither make a choice between competing inferences nor make a credibility determination"). However, where it would be "a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" due to the fact that Plaintiff has failed to establish the requisite minimums, summary judgment will be granted. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983); *see also Rand,* 42 F.3d at 1146 ("[i]nferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors"). Such is the lesson of *Peerman,* where Plaintiff fails to establish an adequate nexus between the decedent and the product, summary judgment will be granted, unresolved causation notwithstanding.

The Court's present inquiry, therefore, follows *Peerman* and remains consistent with the directives of the GOAL order: at a minimum, Plaintiff "must produce evidence sufficient to support an inference that he inhaled asbestos dust from the defendant's product." *Peerman* at 287. Such an inference can only be made "if it is shown that the defendant's product, as it was used during the plaintiff's tenure at the job site, could possibly have produced a significant amount of asbestos dust and that the asbestos dust might have been inhaled by the plaintiff." *Id.*

### Defendant Pittsburgh Corning

 Plaintiff's case implicating Pittsburgh Corning offers only the product iden-

---

12. Plaintiff's attempts to factually distinguish *Peerman* on the grounds "the decedent ... worked for a producer of asbestos-containing products, which was the most likely source of his exposure to airborne asbestos" are misplaced. (Plaintiff's Answer Brief in Opposition to—Defendant Pittsburgh–Corning at 3, 4;—Defendant Owens–Corning at 6, 7;—Defendant Georgia–Pacific at 4;—Defendant A.W. Chesterton at 3). The *Peerman* court addressed the potential exposure to the defendant products before the court at that

time *without regard* to what may or may not have been the "most likely source."

13. "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the possibilities are at best evenly balanced it becomes the duty of the court to direct a verdict for the defendant." W. Prosser, The Law of Torts 241 (4th ed. 1971).

tification evidence of Grant Beauchamp's second affidavit. As set forth above, this evidence must be disregarded due to failure to comply with the GOAL. Further, while Tim McMurtry testified about solid asbestos furnace walls and evidence indicates the furnaces were regularly removed and replaced, Tim McMurtry was unable to name a specific manufacturer. Absent product identification evidence summary judgment must be granted in favor of Defendant Pittsburgh Corning.

■ Nevertheless, even were this Court to take into full consideration Grant Beauchamp's product identification evidence, summary judgment would remain appropriate. Assuming, *arguendo*, Grant Beauchamp's Unibestos identification is accepted, Plaintiff's evidence fails to satisfy the second half of the *Peerman* analysis that requires Plaintiff to establish that Defendant's product "could possibly have produced a significant amount of asbestos dust *and that the asbestos dust might have been inhaled by the plaintiff.*" *Peerman* at 287 (emphasis added).

Under the present facts, although Plaintiff provided evidence of a possible means for the production of asbestos dust by a pipecovering, Plaintiff failed to provide evidence of airborne asbestos dust caused by P–C Unibestos. Plaintiff only offers the deposition testimony of Grant Beauchamp which provides as follows:

Q: What have you observed while working at ALCOA as a reason to see asbestos in the air; what have you seen?

A: If asbestos covering ruptures on the steam lines, if steam[ ] lines shake and rattle and they do, they pound, they condensate, it vibrates and shakes the piping and insulation too. That's on the steam lines. Otherwise, if it's not damaged, it doesn't generally get airborne.

(Beauchamp Dep. at 346). The testimony going towards exposure is conclusory and speculative. Plaintiff's use of Grant Beauchamp's testimony fails to establish a genuine issue of material fact.

Drawing the inferences proffered would eliminate the causation requirement. As-

suming Grant Beauchamp speaks of steam lines in the Ingot Department, at ALCOA, he nevertheless speaks generally. Grant Beauchamp speaks of the general characteristics of steamlines. Grant Beauchamp did not testify to the presence of damaged piping or damaged pipe insulation in the Ingot Department before or during Charles Harris' ALCOA tenure. Grant Beauchamp's testimony could not be more clear: "[I]f it's not damaged, [asbestos] doesn't generally get airborne." (Beauchamp Dep. at 346). Plaintiff wishes to merely identify P–C Unibestos and direct the Court to a possible means producing asbestos fibers without providing evidence that P–C Unibestos caused dust that could have been inhaled by the decedent.

Returning to the facts of *Peerman*, there was no dispute the plaintiff had identified an asbestos-containing product, nor that the asbestos-containing product was capable of producing airborne asbestos fibers. 35 F.3d at 286–87. However, the *Peerman* plaintiff failed to establish the requisite nexus between airborne asbestos dust caused by the Defendant's product and the concerned decedent. *Id.* The *Peerman* plaintiff provided evidence of the decedent near the packaged product and she provided evidence of the product when applied, but she failed to provide evidence of the decedent near the defendant product when applied and consequently capable of producing airborne asbestos. The present Plaintiff provides this Court with even more attenuated evidence—there is no evidence Unibestos actually caused dust. Plaintiff is not entitled to the inferences she seeks. This is not a credibility determination, this is a matter of requiring Plaintiff to "set forth specific facts showing that there is some genuine issue for trial." Fed.R.Civ.P. 56(e); *Peerman* at 287, citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *see also Peak v. Campbell,* 578 N.E.2d 360, 361 (Ind.1991) (at trial Plaintiff bears the burden of proof on the essential element of causation). Thus, regardless of the admissibility of Grant Beauchamp's testimony, Defendant Pittsburgh–Corning's motion for summary judgment must be granted.

### Defendant Owens–Corning

■ Plaintiff claims Charles Harris was exposed to OCF Kaylo. Product identification testimony, however, primarily comes from Grant Beauchamp and Kenny Pate, two individuals who did not distinguish the generic kaylo manufactured by any number of companies from Defendant OCF's Kaylo. To impose liability upon OCF this indefinite testimony would be a *de facto* application of a market share theory, an approach which no Indiana court has ever adopted and regularly rejected in the asbestos context by other courts. *See, e.g., Wood v. Eli Lilly & Co.*, 38 F.3d 510 (10th Cir.1994); *Jackson v. Anchor Pkg. Co.*, 994 F.2d 1295 (8th Cir.1993); *Robertson v. Allied Signal, Inc.*, 914 F.2d 360 (3d Cir.1990). Due to insufficient product identification, therefore, summary judgment is granted in favor of Defendant Owens–Corning.

### Defendant Georgia–Pacific

■ Plaintiff seeks to impose liability upon Defendant Georgia–Pacific based upon Charles Harris' alleged/potential exposure to GP Bestwall and GP Joint Compound. Regarding this Defendant, summary judgment is granted in part and denied in part. Summary judgment is granted for Defendant Georgia–Pacific to the extent Plaintiff seeks damages based upon exposure to GP Bestwall. Grant Beauchamp, the only identification witness, could not identify the use nor the purpose of GP Bestwall and absolutely could not testify to witnessing its installation, removal or other potential dust creating activity. Under *Peerman* Plaintiff has failed to show that the product was used at that jobsite or that it was a significant source of asbestos dust that could possibly have been inhaled by the decedent. To that extent, therefore, summary judgment for Georgia–Pacific must be granted.

■ For GP Joint Compound identification Plaintiff brings forward Grant Beauchamp and Tim McMurtry. Both witnesses indicate GP Joint Compound was used on the metal troughs used for the run-off of molten aluminum. Georgia–Pacific contends this usage of its Joint Compound is not possible. At this stage in the proceedings, this Court will not weigh the relative merits of the proffered evidence nor make an improper credibility determination. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–251, 255, 106 S.Ct. 2505, 2510–2512, 2513–2514, 91 L.Ed.2d 202 (1986); *Cameron v. Frances Slocum Bank & Trust Co.*, 824 F.2d 570, 575 (7th Cir.1987). Summary judgment, therefore, must be denied.

### Defendant Anchor Packing

■ Anchor Packing is named in this lawsuit because Plaintiff claims the decedent was exposed to Anchor Packing sheet gaskets and pre-cut gaskets. Grant Beauchamp and Kenny Pate both testified to the usage of Anchor Packing products at ALCOA Warrick operations, however, neither witness could place Anchor Packing products in any proximity to the decedent Charles Harris. In fact, neither witness could even place Anchor Packing products within the Ingot Department, Charles Harris' work place, an enclosed area covering in excess of one square mile.

Even granting the Plaintiff the benefit of all reasonable inferences, it would not be reasonable, nor would it be consistent with *Peerman,* to allow Plaintiff's claim to survive where the Defendant product cannot even be placed in the same building as the decedent. Plaintiff has failed to "produce evidence sufficient to support an inference that he inhaled asbestos dust from the defendant's product," *Peerman,* therefore summary judgment favoring Anchor Packing must be granted.

### Defendant Garlock

■ Garlock is implicated in this lawsuit because Grant Beauchamp, Kenny Pate and William Shaw provided testimony that they observed Garlock products at ALCOA Warrick operations. Grant Beauchamp's testimony, however, is similar to that encountered with Anchor Packing: he could not even place Garlock's gasketing material in the same square mile as the decedent. Kenny Pate and William Shaw both identified gasketing within the Ingot Department, but, similar to "kaylo," they had no recollection of a specific manufacturer. They could only use "garlock" as a generic term. Thus, absent

sufficient product identification, summary judgment favoring Defendant Garlock must be granted.

### Defendant John Crane

■ Plaintiff names Defendant John Crane in this action alleging decedent's exposure to John Crane fluid sealant product. Plaintiff directs the Court to Grant Beauchamp, J.V. Sexton, and William Shaw for product identification. As set forth above, Grant Beauchamp's testimony concerning John Crane products conflicts. This, of course, is insufficient to create a question of fact, but this is not of immediate concern as the testimony of the other two witnesses is sufficient for Plaintiff to survive summary judgment.

Neither J.V. Sexton nor William Shaw knew the decedent Charles Harris. Both witnesses, however, were able to indicate the presence of John Crane products. Both witnesses also testified these products could have been a source of dust. Drawing the inference that these products were asbestos-containing and also inferring that the decedent could have worked on these products as a furnace operator, summary judgment must be denied. Based on this evidence, this Court cannot discount at this stage that John Crane products could "possibly have produced a significant amount of asbestos dust and that the asbestos dust might have been inhaled by the plaintiff." *Peerman.* Again, however, Plaintiff should be advised, this is an inference that only survives due to the nature of summary judgment proceedings. Nevertheless, summary judgment must be denied.

### Defendant AWC

Defendant AWC was named in this lawsuit due to decedent's potential exposure to its asbestos-containing products. Plaintiff directs the Court to J.V. Sexton and Joe Hayes for product identification. As set forth above, while both testified to the presence of AWC asbestos-containing products, only J.V. Sexton's second affidavit speaks of asbestos fibers from packings becoming airborne when cut or torn into the correct sizes or from shredding during use. The workers in the ingot department would be regularly ex-posed to the asbestos dust from this and other sources. Defendant AWC does not refute this testimony.

Based on the evidence before the Court, similar to Defendant John Crane, this Court cannot discount at this stage that AWC products could "possibly have produced a significant amount of asbestos dust and that the asbestos dust might have been inhaled by the plaintiff." *Peerman.* Summary judgment is denied.

The Court, in light of the foregoing as well as the relevant and applicable case and statutory law, hereby

**GRANTS IN PART AND DENIES IN PART** Defendant **Georgia–Pacific's Motion to Strike,** the motion is granted to the extent Exhibit 15 is stricken, but it is denied to the extent Grant Beauchamp's December 27, 1994 affidavit will not be stricken;

**DENIES Defendants, Garlock Inc. and The Anchor Packing Company's, Motion to Strike Affidavits of Kenny Pate, Jr., Grant Beauchamp, and William Shaw;**

**GRANTS Defendants, Garlock Inc. and The Anchor Packing Company's, Motion to Strike Affidavit of Paul McDaniel Attached to Plaintiffs' Answer Brief to these Defendants' Motions for Summary Judgment;**

**GRANTS Defendants, Garlock Inc and the Anchor Packing Company's, Motion to Strike Affidavit of Jerry Walker;**

**GRANTS Defendant Pittsburgh Corning Corporation's Motion for Summary Judgment;**

**GRANTS IN PART AND DENIES IN PART** Defendant **Georgia–Pacific Corporation's Motion for Summary Judgment;**

**GRANTS Defendant Owens–Corning Fiberglas Corporation's Motion for Summary Judgment;**

**GRANTS Defendant, The Anchor Packing Company's, Motion for Summary Judgment, Defendant, Garlock Inc.'s, Motion for Summary Judgment;**

**DENIES** Defendant A.W. Chesterton Company's **Motion for Summary Judgment**

DENIES Defendant John Crane, Inc.'s Motion for Summary Judgment.

ALL OF WHICH IS ORDERED.

### ORDER

This matter comes before the Court on numerous motions for summary judgment and several attendant motions to strike evidentiary materials.

Defendant Pittsburgh Corning Corporation's Motion for Summary Judgment and Memorandum in Support of Defendant Pittsburgh Corning Corporation's Motion for Summary Judgment were filed November 30, 1994. Plaintiffs' Answer Brief in Opposition to Defendant Pittsburgh Corning Corporation's Motion for Summary Judgment was filed January 17, 1995. The Reply Memorandum in Support of Defendant Pittsburgh Corning Corporation's Motion for Summary Judgment was filed February 16, 1995, and Pittsburgh Corning Corporation's Supplement to Reply Memorandum in Support of Motion for Summary Judgment was filed March 31, 1995.

Defendant Georgia–Pacific Corporation's Motion for Summary Judgment and Brief in Support of Georgia–Pacific Corporation's Motion for Summary Judgment were filed November 30, 1994. Plaintiffs' Answer Brief in Opposition to Defendant Georgia–Pacific Corporation's Motion for Summary Judgment was filed January 17, 1995. The Reply Brief in Support of Georgia–Pacific Corporation's Motion for Summary Judgment was filed February 16, 1995.

Defendant John Crane, Inc.'s Motion for Summary Judgment and Brief in Support of John Crane, Inc.'s Motion for Summary Judgment were filed December 2, 1994. Plaintiffs' Brief in Opposition to Defendant John Crane, Inc.'s Motion for Summary Judgment was filed January 17, 1995. Defendant John Crane, Inc.'s Reply Brief in Support of Motion for Summary Judgment was filed March 30, 1995.

Defendant A.W. Chesterton Company's Motion for Summary Judgment and Memorandum of Law in Support of Motion for Summary Judgment were filed December 2, 1994. Plaintiffs' Answer Brief in Opposition to Defendant A.W. Chesterton Company's Motion for Summary Judgment was filed January 17, 1995. The Reply Brief and Submission in Support of A.W. Chesterton's Motion for Summary Judgment was filed February 3, 1994.

Defendant, The Anchor Packing Company's, Motion for Summary Judgment, Defendant, Garlock Inc.'s, Motion for Summary Judgment, and the Brief in Support of Defendants, The Anchor Packing Company, and Garlock Inc., Motions for Summary Judgment were filed March 3, 1995. Plaintiffs' Answer Brief in Opposition to Defendant Anchor Packing and Garlock Inc.'s Motions for Summary Judgment was filed March 17, 1995. Garlock Inc. and The Anchor Packing Company's Supplemented Reply Brief in Support of their Motions for Summary Judgment was filed April 3, 1995.

Defendant Owens–Corning Fiberglas Corporation's Motion for Summary Judgment and Memorandum in Support of Defendant Owens–Corning Fiberglas Corporation's Motion for Summary Judgment filed March 3, 1995. Plaintiff's Answer Brief in Opposition to Defendant Owens–Corning Fiberglas Corporation's Motion for Summary Judgment was filed March 17, 1995. The Reply Brief of Defendant Owens–Corning Fiberglas in Support of its Motion for Summary Judgment was filed March 28, 1995.

Defendant Georgia–Pacific's Motion to Strike was filed February 16, 1995. Plaintiff did not respond to this motion.

Defendants, Garlock Inc. and The Anchor Packing Company's, Motion to Strike Affidavit of Paul McDaniel Attached to Plaintiffs' Answer Brief to these Defendants' Motions for Summary Judgment and Defendants, Garlock Inc. and The Anchor Packing Company's, Motion to Strike Affidavits of Kenny Pate, Jr., Grant Beauchamp, and William Shaw, attached as exhibits to Plaintiffs' Answer Brief in Response to These Defendants' Motions for Summary Judgment were filed March 28, 1995, and Defendants, Garlock Inc. and the Anchor Packing Company's, Motion to

Strike Affidavit of Jerry Walker was filed April 3, 1995. Plaintiff did not oppose these motions to strike.

The Court, in light of the foregoing as well as the relevant and applicable case and statutory law, hereby

**GRANTS IN PART AND DENIES IN PART** Defendant Georgia–Pacific's Motion to Strike, the motion is granted to the extent Exhibit 15 is stricken, but it is denied to the extent Grant Beauchamp's December 27, 1994 affidavit will not be stricken;

**DENIES** Defendants, Garlock Inc. and The Anchor Packing Company's, Motion to Strike Affidavits of Kenny Pate, Jr., Grant Beauchamp, and William Shaw;

**GRANTS** Defendants, Garlock Inc. and The Anchor Packing Company's, Motion to Strike Affidavit of Paul McDaniel Attached to Plaintiffs' Answer Brief to these Defendants' Motions for Summary Judgment;

**GRANTS** Defendants, Garlock Inc. and the Anchor Packing Company's, Motion to Strike Affidavit of Jerry Walker;

**GRANTS** Defendant Pittsburgh Corning Corporation's Motion for Summary Judgment;

**GRANTS IN PART AND DENIES IN PART** Defendant Georgia–Pacific Corporation's Motion for Summary Judgment;

**GRANTS** Defendant Owens–Corning Fiberglas Corporation's Motion for Summary Judgment;

**GRANTS** Defendant, The Anchor Packing Company's, Motion for Summary Judgment, Defendant, Garlock Inc.'s, Motion for Summary Judgment;

**DENIES** Defendant A.W. Chesterton Company's Motion for Summary Judgment

**DENIES** Defendant John Crane, Inc.'s Motion for Summary Judgment.

ALL OF WHICH IS ORDERED.

### ORDER and ENTRY OF FINAL JUDGMENT

This matter comes before the Court on Motion For Entry Of Final Judgment In Favor Of Garlock Inc. And The Anchor Packing Company filed September 5, 1995, and **Motion For Entry Of Final Judgment In Favor Of Pittsburgh Corning Corporation** filed September 22, 1995. Plaintiff's **Response To Defendant Pittsburgh Corning Corporation's Motion For Entry Of Final Judgment** was filed September 22, 1995, and **Plaintiff's Response To Defendants Garlock Inc. And The Anchor Packing Company's Motion For Entry Of Final Judgment** was filed October 2, 1995. **Motion Of Defendant Owens–Corning Fiberglas Corporation, For Entry Of Final Judgment With Respect To Order Previously Made** was filed November 1, 1995.

Also before the Court is Defendant A.W. Chesterton Company's **Motion To Reconsider** and **Brief In Support Of A.W. Chesterton's Motion To Reconsider** filed June 19, 1995.

This matter initially commenced with 44 separate named defendants. Through dismissals, summary judgments and settlements, the number has been reduced dramatically. Summary judgment was granted concerning several defendants in this action on June 6, 1995. Defendant A.W. Chesterton Company ("AWC") was one the defendants denied summary judgment. Alleging various errors of fact and law, AWC moved for reconsideration pursuant to Federal Rule of Civil Procedure 59. This Court's consideration of that motion was stayed pursuant to AWC's informal notification of settlement on or about September 5, 1995. Formal papers reflecting stipulation of settlement have not been filed.

By Order of this Court dated December 5, 1995, Plaintiff was ordered to show cause why final judgment should not issue on or before December 15, 1995. No response has been filed. AWC's motion to reconsider should therefore be addressed at this time, and for the reasons set forth below final judgment in this cause is appropriate with regard to all named defendants.

A Rule 59 Motion to Reconsider is only available to "correct manifest errors of law or fact or to present newly discovered evidence." *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.,* 762 F.2d 557, 561 (7th Cir.1985) (quoting *Keene Corp. v.*

*International Fidelity Ins. Co.,* 561 F.Supp. 656, 665–66 (N.D.Ill.1982)). As detailed in this Court's June 6, 1995 order, AWC is a manufacturer of fluid sealing devices, some of which contained asbestos and some of which did not. (AWC's Reply Brief in Support of Summary Judgment at 1). J.V. Sexton and Joe Hayes both testified to the presence of AWC asbestos-containing products at ALCOA Warrick operations. (Sexton Aff. II; Hayes Aff.). While Joe Hayes' affidavit only indicates the presence of AWC products, J.V. Sexton's second affidavit speaks of asbestos fibers from packings becoming airborne when cut or torn into the correct sizes or from shredding during use. (Sexton Aff. II). Sexton claims the workers in the ingot department would be regularly exposed to the asbestos dust from this and other sources. (Sexton Aff. II).

In denying summary judgment this Court erroneously held that AWC failed to refute Sexton's "direct" product identification testimony. In fact, deposition testimony subsequent to his second affidavit revealed the fact that Mr. Sexton could not distinguish an AWC product from any similar product. (Sexton Dep. at 126). This is not new evidence, rather the Court failed to recognize or otherwise apply this relevant evidence in the earlier order. Accordingly, Plaintiff failed to "produce evidence sufficient to support an inference that he inhaled asbestos dust from the defendant's product." *Peerman v. Georgia–Pacific Corp.,* 35 F.3d 284, 287 (7th Cir. 1994). Defendant A.W. Chesterton Company's **Motion to Reconsider** is therefore **GRANTED,** accordingly Defendant A.W. Chesterton Company's **Motion for Summary Judgment** filed December 2, 1994, is hereby **GRANTED.**

All Defendants having been dismissed, the Clerk is hereby **DIRECTED** to enter **FINAL JUDGMENT** with regard to all Defendants in the above-styled cause.

**IT IS SO ORDERED.**